18734

ROBERT E. LEE & COMPANY, Inc. and Dixie Construction Company of Georgia, Inc., Respondents-Appellants, v. COMMISSION OF PUBLIC WORKS OF THE CITY of GREENVILLE, South Carolina, Appellant-Respondent.

(158 S. E. (2d) 185)

*Messrs. Rainey, Fant & Horton* and *Leatherwood, Walker, Todd & Mann,* all of Greenville, *for Appellant,*

396

*Messrs. Wyche, Burgess, Freeman & Parham,* of Green-
ville, and *Hitch, Miller, Beckmann & Simpson,* of Savannah,
Georgia, *for Respondents,*

*Messrs. Wyche, Burgess, Freeman & Parham,* of Green-
ville, and *Hitch, Miller, Beckmann & Simpson* of Savannah,
Georgia, *for Respondent-Appellants,*

397

*Messrs. Rainey, Fant & Horton* and *Leatherwood Walker, Todd & Mann,* all of Greenville, *for Defendant-Respondent,*

December 5, 1967.

BRAILSFORD, Justice.

The plaintiffs in 1959 contracted to install a 48-inch pipe-line from Travelers Rest in Greenville County to the defendant's North Saluda Dam. The plans furnished by the defendant as the basis of the contract purported to reveal the logs of auger borings which had been made along the pipeline route to determine the character of subsurface materials. After completing the installation, plaintiffs sued for damages, alleging that there were prejudicial discrepancies between the subsurface information represented on the plans and that actually revealed by the test hole borings, which had been logged in contemporaneous field notes. A first trial resulted in a verdict for the defendant, which was reversed on appeal because of errors in the charge and in the admission of evidence. The second trial resulted in a verdict for plaintiffs in the sum of $187,500.00. The defendant has appealed on exceptions which, according to the brief, raise four questions. We, of necessity, shall refer to our opinion on the first appeal to some extent. However, we shall endeavor to avoid unnecessary duplication, and that opinion, *Robert E. Lee & Co. v. Commission of Public Works of City of Greenville,* 248 S. C. 84, 149 S. E. (2d) 55, should be read for a full understanding of the case.

The first and second questions argued by the defendant relate to the following excerpt from the charge:

"The defendant admits that it failed to reveal on the plans the water encountered in making the auger borings on the plans and specifications, and it also appears beyond dispute that changes were made in the subsoil classifications recorded at the time of making the borings. I charge you that failing to record upon the plans the water and subsoil conditions actually encountered constitutes a breach by the defendant of its implied warranty."

The defendant first contends that the court erred in charging the jury "that the defendant failed to properly record the subsoil conditions upon the plans." The error assigned is that there was a dispute in the evidence as to whether the plans correctly revealed the subsoil conditions actually encountered; hence, this issue should have been submitted to the jury. We find no merit. The logs of the test borings as represented on the plans bore little resemblance to the field notes, which showed the unsatisfactory subsurface conditions actually encountered.

After the first trial, M. H. Woodward, a soil expert employed by the defendant, made borings near the test holes shown on the plans. This expert witness testified that any differences between soil classifications revealed by his borings and those shown on the plans were inconsequential. The defendant relies upon this testimony in contending that whether subsurface conditions had been misrepresented was an issue of fact for the jury. This disregards the witness' forthright distinction between technical soil classifications and the character of subsurface materials, which latter the defendant was bound to fully and accurately disclose. The following comparison of the logs of a few of the Woodward borings with the original field notes and the logs shown on the plans refutes the claim that this witness' testimony raised an issue of fact in this respect:

| Hole No. | Field Notes | | Plans | | Woodward Borings | |
|---|---|---|---|---|---|---|
| "59 | 0'–4' | Black Dirt | 0'–4' | Silt | 0'–1' | Sandy Topsoil |
| | 4'–7' | Blue Mud & Water | 4'–7' | Clay | 1'–7' | Saturated Brown, Plastic Clay— |
| | 7'–10' | Sand & Water | 7'–10' | Sand | | Water at 7 feet |
| | | | | | 7'–10' | Coarse sand with fine gravel, saturated |
| | | | | | | |
| 79 | 0'–4' | Sand | 0'–4' | Sand | 0'–1½' | Sandy Topsoil |
| | 4'–6' | Brown dirt | 4'–6' | Sandy Clay | 1½'–7' | Soft dark Grey Clayey Silt, |
| | 6'–10' | Blue Mud & Water | 6'–10' | Clay | | saturated, Water at 7 feet |
| | | | | | 7'–10' | Grey coarse sand |
| | | | | | | |
| 119 | 0'–3' | Red Sandy Dirt | 0'–8' | Sandy Clay | 0'–1' | Sandy Topsoil |
| | 3'–8' | Gray Sandy Clay | 8'–10' | Clayey Sand | 1'–8' | Buff Sand-Clay Water at 6 feet |
| | 8'–9' | Sandy Clay & Water | | | 8'–10' | Grey, saturated Micaceous, silty sand |
| | 9'–10' | Blue Clay & Water | | | | |
| | | | | | | |
| 155 | 0'–5' | Brown Dirt | 0'–5' | Clay | 0'–1' | Sandy Topsoil |
| | 5'–10' | Yellow Mud & Water | 5'–10' | Sandy Clay | 1'–2.7' | Brown, plastic, clay silt |
| | | | | | 2.7'–8' | Grey, vermiculite soft saturated, Water at 7 feet |
| | | | | | 8'–10' | Damp, tan sandy silt." |

The defendant next urges that the court erred in charging the jury that its failure to record upon the plans the water encountered in making test borings constituted a breach of implied warranty. The error assigned is that the defendant never purported to show water conditions on the plans, and this determination was left open to the independent investigation of the bidders. This contention has been urged by the defendant from the inception of the litigation and is foreclosed by our decision on the prior appeal, which is binding upon the parties both as a precedent and as the law of this case. In the light of the issues before the court, the following excerpts from the opinion require this conclusion:

"The statement in SC-25 before quoted, that the owner had made auger borings along the pipeline route to determine the character of the subsurface materials, and that the location and logs of these test holes were shown on the plans, was a representation that the *subsurface information* revealed by the test hole borings *had been accurately and fully disclosed* on the plans. The contractor was entitled to rely upon that representation; and the owner's responsibility under it was not overcome by the disclaimer clauses above quoted.

\* \* \*

"Several exceptions charge error in permitting testimony as to general, or good, engineering practice: (a) in regard to the furnishing, by the owner to the contractor, of information concerning ground water; and (b) in regard to independent investigation by bidders on water pipeline contracts, as to subsoil conditions and ground water. Since such testimony was incompetent to overcome the obligation of *full disclosure* heretofore discussed, objection to it should have been sustained." (Emphasis ours.) 248 S. C. at 90-92, 149 S. E. (2d) at 58-59.

We now reach the third question, which relates to the admission of evidence and the charge as to damages. E. H. Kemp, an officer of the plaintiff Dixie Construction Company of Georgia, Inc., was the engineer in charge of installing the pipeline. From time to time during the course of the work he submitted to defendant "change orders" claiming compensation for additional work made necessary by unsatisfactory subsurface conditions revealed by the field notes of the test boring but not disclosed by the plans. Certain errors in these claims were corrected at the first trial, and, as corrected, they totaled $234,216.96, which Kemp testified was the amount of damage sustained as a result of defendant's breach of the implied warranty. However, the *ad damnum* clause of the complaint and the prayer for relief claimed damages of $260,804.09. An expert witness, who had made a study of the field notes of the test hole borings

and of the logs shown on the plans, was allowed to express his opinion as to the reasonable cost of the work under the conditions revealed by the former, as compared with its reasonable cost under the conditions. represented by the latter. He estimated the additional cost to be $282,599.00. The court instructed the jury that its verdict could not exceed $260,804.09, the sum demanded in the complaint. The third point argued in the brief is that plaintiffs should "have been restricted in the proof and in the charge to damages not exceeding those to which (Kemp) testified comprised (the) loss."

We think that the testimony of the expert witness ██ was clearly admissible on the issue of whether plaintiffs were damaged by defendant's misrepresentation of the subsurface conditions revealed by the test borings. Assuming without deciding, that defendant was entitled to an instruction that the sum of the "change orders" was the limit of plaintiffs' recovery, the jury's verdict was for substantially less than this figure. Therefore, no prejudice resulted from the court's instruction that the amount demanded in the complaint was the maximum which might be awarded.

The final point argued in the brief is that the jurors were coerced into arriving at a verdict "by the action of the trial judge in requiring them to deliberate from 2:40 P.M. Friday afternoon until 2:35 A.M. Saturday morning." The trial of this case commenced on Monday and extended to Friday afternoon. The jury began its deliberations at 2:40 P.M. At 7:15 the jurors were returned to the courtroom, and the judge delivered what the defendant refers to as "the usual 'pep talk'" on the importance of arriving at a verdict. The jurors were then sent to supper and resumed their deliberation at 9:00 P.M. Coffee was sent to them at 2:00 A.M. and agreement upon verdict was announced at 2:35.

The handling of the jury during its deliberations ██ was peculiarly within the discretion of the trial judge. The record does not indicate that counsel for

either party objected to the manner in which this discretion was exercised in this instance until after the verdict was announced. The judge was courteous to and considerate of the jurors, who never stated that they were deadlocked or unable to agree. No one suggests that after a trial of this magnitude the jury should have been sooner discharged. The record indicates that the court's discretion was soundly exercised. We find no merit in this exception.

The plaintiffs have appealed from the refusal of their motion for judgment in the amount of the verdict plus the additional sum of $69,375.00 as interest thereon, computed from the completion of the contract on December 10, 1960, to the date of the verdict. They state the questions raised by their appeal as follows: "Is prejudgment interest due under a construction contract on damages for increased construction costs resulting from breach of implied warranty as to construction conditions?"

We do not reach this question. The issue of damages was submitted to the jury without reservation, and a general verdict was rendered. Plaintiffs do not ask for a new trial for error in the charge as to the measure and amount of allowable damages. They seek judgment on the verdict and are necessarily bound by the instructions under which it was shaped. In this action at law plaintiffs are entitled to only one recovery, and that by the verdict of a jury under the charge of the trial judge. The instructions were intended by the court and acted on by the jury as the basis of a general verdict for the aggregate of compensatory damages suffered by the contractors. Plaintiffs' entitlement to compensation has merged in the verdict, which the judgment must follow.

Affirmed.

Moss, C. J., and Lewis, Bussey and Littlejohn, JJ., concur.